ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Amentum Services, Inc., f/k/a AECOM | ) ASBCA Nos. 62835, 62836, 62837 |
| Management Services, Inc. | ) 62838, 62839, 62840 |
| | ) |
| Under Contract No. NNK15OL50B | ) |

APPEARANCE FOR THE APPELLANT:     Thomas M. Brownell, Esq.
                                   Holland & Knight LLP
                                   Tysons, VA

APPEARANCES FOR THE GOVERNMENT:    Scott W. Barber, Esq.
                                   NASA Chief Trial Attorney
                                   Samantha R. Cochran, Esq.
                                   Marshall D. McKellar, Esq.
                                   Trial Attorneys
                                   Kennedy Space Center, FL

OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS

In 2015, the National Aeronautics and Space Administration (NASA) Kennedy Space Center (KSC) awarded a contract for launch services to appellant, Amentum Services, Inc. (Amentum), formerly known as AECOM Management Services, Inc., which was, in turn, known as URS Federal Services at the time of award.[1] Amentum was the incumbent contractor at KSC; however, the contract awarded in 2015 was a firm-fixed-price contract, while the prior contract was a cost-type contract. This change in contract type was at least partially responsible for several of the issues currently before the Board.

Amentum appeals from a contracting officer's final decision denying various claims related to the contract. Amentum's first claim (ASBCA No. 62835) asserts that the government failed to satisfy the contract's minimum ordering requirement. The parties disagree as to when certain negotiated task orders should be recognized on the contract. We hold that the amount of the task order was properly applied to the contract's minimum ordering requirement in the year of award, but that the descoped amount must also be deducted from the minimum order amount for the year that it was awarded. Accordingly, we find that the government failed to satisfy the minimum ordering amount.

---

[1] For simplicity we refer to appellant as Amentum throughout this opinion.

Amentum's second claim (ASBCA No. 62836) asserts that the government improperly required Amentum to create a new contract line item, rather than pricing the work under a "downmode maintenance" provision of an existing line item. Regardless of the merits of Amentum's argument, we hold that Amentum agreed to the pricing in a bilateral modification, and has waived whatever claim it might have had. Amentum's third claim (ASBCA No. 62837) pertaining to the pricing of new tasks allegedly without the proper allocation of indirect costs, was similarly waived by a bilateral contract modification.

Amentum's fourth claim (ASBCA No. 62838) asserts that NASA wrote a task out of the contract by developing a new source for jet fuel at KSC. The contract at issue is an Indefinite Delivery/Indefinite Quantity (IDIQ) contract with a minimum ordering requirement, not a requirements contract. We hold that Amentum has not established a violation of the contract and has not demonstrated bad faith on the part of the government.

Amentum's fifth claim (ASBCA No. 62839) seeks compensation for hurricane shutdowns at KSC. We hold that the firm-fixed-price contact does not entitle Amentum to compensation. Amentum's sixth claim (ASBCA No. 62840) concerns an allegedly ambiguous contract term or mistake in bidding. We hold that Amentum has not established that the contract was ambiguous or that it is entitled to recover pursuant to a mistaken bid.

FINDINGS OF FACT APPLICABLE TO ALL APPEALS

Appellant AECOM Management Services, Inc. (AECOM) is a Delaware corporation. Effective February 1, 2020, AECOM changed its name to Amentum Services, Inc. and is now known by that name. (Stipulations of the Parties, filed Apr. 15, 2022 (jt. stip.) ¶ 1) AECOM Management Services, in turn, was known as URS Federal Services at the time of award (*id.* ¶ 3). The John F. Kennedy Space Center (KSC) is a NASA field center located in Florida. (*Id.* ¶ 2)

NASA Contract No. NNK15OL50B (also known as the Kennedy Space Center Propellants and Life Support Services Contract, KPLSS, KPLSS I, or the contract) was a contract for the performance of launch-related operations and maintenance services at KSC. Its main customers were KSC and the Cape Canaveral Air Force Station (CCAFS). NASA awarded the contract to URS Federal Services (now Amentum) with a period of performance of October 1, 2015 – September 30, 2020. (R4, tab 1 at 2-3; jt. stip. ¶ 3) The KPLSS contract was a successor to NASA's Institutional Services Contract (ISC) (tr. 1/26-28). The ISC contract was a cost-plus contract (tr. 2/134). Amentum was the incumbent contractor on the ISC and had performed the work included in the KPLSS contract under ISC for a number of years (tr. 1/26–28).

2

The new KPLSS IDIQ contract consisted of firm-fixed-price unit rates called Task Item Numbers (TINs). These TINs were identified and described in the KPLSS Catalog of Services, Attachment J-02. (R4, tab 2 at 101-39) The government could also order services using Negotiated Task Orders (NETOs). NETOs are for ordering services within the scope of KPLSS, but otherwise not in the main catalog of TINs. (Jt. stip. ¶ 5) In addition, the contract provided for Contractor Third-Party Work (C3PW). The contract, in attachment J-21, provides that the C3PW provisions are applicable to any work "performed by the Contractor on KSC and paid for via any agreement other than this contract, another NASA prime contract, or a NASA subcontract (at any tier)"[2] (gov't hrg., ex. 2 at 1).

On April 18, 2019, Amentum submitted a request for equitable adjustment (REA) concerning NASA's failure to satisfy the minimum contract value, the downmode maintenance provision, the inability to charge overhead costs on new TINs and the jet fuel TIN (R4, tab 4 at 159-60). NASA denied the REA on November 19, 2019 (*id.* at 160). Amentum submitted a claim asserting the four issues contained in its REA, plus claims pertaining to government hurricane shutdowns and the pricing issue pertaining to launch support services, as well as a claim pertaining to the 2018-19 government shutdown due to a budget impasse that was not appealed to the Board (*id.*). The contracting officer denied Amentum's claim in a final decision dated February 16, 2021 (R4, tab 5 at 181-85). Amentum timely appealed to the Board.

On February 4, 2022, the government filed a motion for summary judgment. Unfortunately, the motion was filed during an e-mail outage and the Board was unaware of the motion until receiving Amentum's opposition on March 7, 2022. On April 13, 2022, the government moved to stay the hearing pending resolution of its motion for summary judgment filed over two months earlier. By order dated April 21, 2023, we elected to defer consideration of the motion for summary judgment until the hearing, which was at that point less than a month away.[3]

---

[2] In other words, work performed by Amentum for third-parties on KSC count against the contract minimum because the work benefits from the use of KSC resources and facilities and may involve the use of government property (gov't hrg., ex. 2 at 1).

[3] Our decision is based upon the hearing record and is not a decision on the motion for summary judgment.

**Findings of Fact Pertaining to Claim 1 ASBCA No. 62835: Minimum Contract Value**

The KPLSS contract included a minimum contract value of $8 million per year:

> B.2 Contract Minimum
> The minimum contract value for each contract year, which includes all TOs issued, is $8,000,000, as shown in Table B.2.1.
>
> Any monies received by the Contractor for the same or similar ser vices offered under this contract, regardless of the customer requesting such service (s) and the contractual mechanism used to perform the work, shall be applied toward the minimum contract value.

(R4, tab 1 at 28)  The contract defines "TO" as "task order" in multiple places (*e.g.*, R4, tab 1 at 7, 73, tab 3 at 157) and provides that services will be ordered by task order (R4, tab 1 at 73 ( FAR 52.216-18)).  The $8 million minimum contract value was based upon an estimate of the amount of propellants and life support work that NASA and the Air Force had purchased in FY 2013 and 2014 and that they were thus willing to guarantee (*see* tr. 2/144-45).  Amentum's bid price for the KPLSS I Contract, based upon the NASA-provided Best Estimated Quantities (BEQs), was approximately $7.4 million (tr. 1/29-30).  Based upon prior years' experience, NASA expected the winning bid to be in the range of $10-13 million (tr. 3/14).  During proposal discussions, NASA requested additional information from Amentum regarding its overall pricing methodology because the total evaluated price was below the minimum contract value (R4, tab 21 at 293; jt. stip. ¶ 39).  Amentum did not change its bid price when NASA questioned it in discussions with Amentum prior to award of the contract (tr. 1/38-39).  Amentum's representative, Mr. Larry Ostarly, testified that Amentum was able to reduce its price to NASA by using corporate resources to provide human resources, contracts, and procurement services, which otherwise would have been charged direct to the contract (tr. 1/42-43).

During FY 2016, which ended on September 30, 2016, NASA and the Air Force ordered TIN and Negotiated Task Order (NETO) work under the KPLSS Contract as follows (R4, tab 7 at 208):

|  | TINs | NETOs | Total |
| --- | --- | --- | --- |
| NASA | $5,200,991.95 | $638,581.59 | $5,839,573.54 |
| Air Force | $2,309,395.64 | $134,045.69 | $2,443,441.33 |
| Total | $7,510,387.59 | $772,627.28 | $8,283,014.87 |

As early as April or May 2016, the government issued a request for proposal to Amentum for a NETO for relief valve testing that was not covered under the existing KPLSS TINs (tr. 2/153-54). Amentum responded to the RFP in August 2016 (tr. 2/155). On September 14, 2016, 16 days before the end of the fiscal year, after evaluating Amentum's proposal, NASA issued Task Order NNK16OM20T (20T), in the amount of $444,951.06, for installation of a relief valve test kit (app. supp. R4, tab 30 at 2).

After award of task order 20T, Amentum received a bid from a second vendor, at a price approximately $300,000 less than the first vendor (tr. 1/180-81). The equipment from the second vendor met the specifications set forth in NASA's RFP for task order 20T and Amentum could have simply delivered the new equipment and kept the $300,000 in savings (tr. 2/42). Instead, Amentum proposed a reduction in the price of task order 20T and NASA agreed, resulting Modification No. 1, dated May 19, 2017, which descoped task order 20T by $334,050.76, to a total of $110,900.30 (app. supp. R4, tab 30 at 4). The task order modification to descope task order 20T includes the following release language:

> [Amentum] hereby releases the Government from any and all liability or claims under this contract for any further equitable adjustments attributable to such facts or circumstances giving rise to proposal dated April 7, 2017, and all revisions thereto.

(App. supp. R4, tab 30 at 5)

On September 28, 2016, 2 days before the end of FY 2016, the Air Force issued task order FA2521-16-F-0194, in the amount of $134,045.69, for the relocation of

3 mobile storage units from Cape Canaveral Air Force Station (CCAFS)[4] to Patrick Air Force Base (PAFB)[5] (app. supp. R4, tab 31 at 1-6). The two task orders issued in September 2016 could not have been performed during FY 2016 (tr. 1/178-80, 184).

Task orders issued for TINs were funded incrementally, in advance, by NASA and the Air Force. Any remaining funds at the end of the contract year were deobligated by NASA and the Air Force. (Tr. 1/50-52, 2/158-59) For TIN-based orders, NASA subtracted the deobligated funds from the contract minimum value for the year in which the task order was initially issued (*id.*; tr. 2/159-60).

### DECISION Claim 1 ASBCA No. 62835: Minimum Contract Value

As noted in the facts above, the contract had a minimum ordering requirement of $8 million in FY2015. The total contract value for issued task orders was $8,283,014.87 (jt. stip. ¶ 7). Amentum contends that the ordered amount is overstated due to two negotiated task orders that were issued in the final days of the performance period and that were not capable of being performed during the fiscal year. Additionally, the task order for the test kit was descoped during FY2017, reducing the task order amount by $334,050.76. With these deductions, Amentum contends that the actual ordered amount is $7,704,017.12 (app. br. at 16). The government contends that the task orders were properly recorded in the fiscal year issued and contends that the deobligated amount should be credited against the orders in the year the task order was modified (gov't resp. at 26-33).

Claim 1 requires that we interpret contract paragraph B.2 to determine whether the government failed to satisfy the minimum ordering requirement. The contract provides that:

> B.2 Contract Minimum
> The minimum contract value for each contract year, which includes all TOs issued, is $8,000,000, as shown in Table B.2.1.
>
> Any monies received by the Contractor for the same or similar services offered under this contract, regardless of the customer requesting such service (s) and the contractual mechanism used to perform the work, shall be applied toward the minimum contract value.

---

[4] Now known as Cape Canaveral Space Force Station (CCSFS)
[5] Now known as Patrick Space Force Base (PSFB)

(R4, tab 1 at 28)[6]  The contract defines "TO" as "task order" in multiple places (*e.g.*, R4, tab 1 at 7, 73, tab 3 at 157) and provides that services will be ordered by task order (R4, tab 1 at 73 (FAR 52.216-18)).  Applying the plain meaning of paragraph B.2, we conclude that "TO" includes all task orders, including both task item number (TIN) task orders and negotiated task orders (NETOs).  Thus, the first paragraph of section B.2 is clear that the government was required to "issue" task orders in the minimum amount of $8,000,000.  We accord the term "issued" its ordinary meaning and conclude that the government issued over $8 million in task orders in FY 2016.

However, we must also interpret the second paragraph of clause B.2 in connection with paragraph B.1.  The parties submitted a joint stipulation of fact that the reference to "the same or similar services" in clause B.2 was a reference to NETOs (jt. stip. ¶ 5).  However, at the hearing, NASA asserted a new theory, that the reference to "the same or similar services" in clause B.2 was a reference to Contractor Third-Party Work (C3PW).  The contract, in attachment J-21, provides that it is applicable to any work "performed by the Contractor on KSC and paid for via any agreement other than this contract, another NASA prime contract, or a NASA subcontract (at any tier)" (gov't hrg., ex. 2 at 1).  Testimony at the hearing provided that the clause was intended to prevent the contractor from performing work for third parties, such as SpaceX, and bypassing NASA.  No C3PW work was performed during the relevant period.  Amentum's deputy program manager, Mr. Korte, acknowledged at the hearing that CP3W work would have counted against the contract minimum if received during the applicable period (tr. 2/26).

As an initial matter, contract interpretation is a question of law, so we are not bound to accept the parties' joint stipulation as to the meaning of clause B.2.  The second paragraph refers to "the same or similar services . . . regardless of the customer requesting such service (s) and the contractual mechanism used to perform the work."  We interpret this clause to apply to work, such as C3PW work, being performed for parties other than NASA or the Air Force and not performed pursuant to government task orders (either TIN or NETO).  Thus, read in conjunction with attachment J-21, we hold that the "monies received" language in paragraph 2 does not apply to task order work, and that the government satisfied the minimum contract value (subject to the deobligation issue discussed below) by ordering $8 million in task orders.  This is consistent with our holding in *WSP USA Solutions, Inc.*, ASBCA No. 62674, 22-1 BCA ¶ 38,219 at 185,628, that pricing for a task order is set when the task order is

---

[6] This language was modified in the follow-on KPLSS II contract to provide that subsequent modifications to task order values would be applied to the year in which the modification is issued (app. supp. R4, tab 27 at 3, ¶ B.2).  We do not use the language of a subsequent contract to interpret the meaning of the original contract.  *See, e.g.*, *Capital Servs., Inc.*, ASBCA Nos. 40510, 40511, 91-1 BCA ¶ 23,310 at 116,907.

placed. In *WSP*, the contractor argued that the tasks ordered in one contract year, should be billed at the rate applicable to the contract year in which the task was actually performed. The language of paragraph B.2 does not specify when in the fiscal year the government will place the orders, so we reject Amentum's argument that orders placed late in the fiscal year that could not be performed during the fiscal year do not count toward the minimum order value.

This does not end our analysis, because NASA deobligated a portion of task order 20T. As set out in the facts, NETO 20T was awarded for a test kit. After the TO was awarded in the amount of $444,951.06, Amentum received another response to its solicitation, offering a test kit that satisfied the specifications, and Amentum revised its proposal to $110,900.30. Amentum, to its credit, informed NASA about the late response and agreed to a bilateral modification on May 19, 2017, decreasing TO 20T by $334.050.76. This raises the novel question of whether a reduction in the value of the task order, occurring in a subsequent fiscal year, should be deducted from the contract award amount in the year the TO was awarded, or the year of the modification, or at all. Surprisingly, this appears to be a question of first impression. The parties did not cite to any case law on the question, and we were unable to locate any authority on the subject.

The government argues, based upon the GAO Red Book of fiscal law, that the task order was an unmatured obligation, subject to cancellation, but that the agency obligation was fixed at the time of award (gov't resp. at 32). Thus, the government argues that the obligation was valid when issued, so it should count against the contract minimum order value and a descope should apply to the year of the modification because the contractor controls performance (*id.*). However, fiscal law provisions relate to agency budgeting, not contractual rights. Hearing testimony demonstrated that for the TIN-based task orders, work ordered but not performed or ultimately not needed by the government would be descoped and that the government would deobligate the funds for the year in which the task order was issued (tr. 2/158-60). The government argues that "there is no evidence in the record to show that negotiated task orders . . . would be descoped or deobligated in the same way" (gov't resp. at 31). However, it is equally true that there is no evidence in the record, that the NETOs should be treated different from other task orders. Further, the government asserts that the descope or deobligation of a NETO is a "rare occurrence" and that the "often lengthy performance periods" require that the deobligated amount apply against the contract minimum for the year in which the modification occurs (*id.*). However, the government cites no authority for this position.

Based on the record before us, and with the contract being silent on the treatment of deobligated funds, we hold that the deobligated task order amount, $334,050.76, should be deducted from the ordering amount for the year the task order was issued, consistent with NASA's treatment of TIN-based task orders. Accordingly,

8

the government ordered $7,948,964.11 during the FY2015 ordering period—$51,035.89 less than the minimum order amount.[7] The government's failure to order the minimum quantity is a breach of contract.

The government additionally argues that Amentum waived its claim for failure to order the minimum quantity by agreement to the bilateral contract modification that descoped the task order (gov't resp. at 33). The modification contained the following release language:

> The parties hereto agree that this supplemental agreement represents a complete and equitable adjustment. URS hereby releases the Government from any and all liability or claims under this contract for any further equitable adjustments attributable to such facts or circumstances giving rise to proposal dated April 7, 2017, and all revisions thereto.

(App. supp. R4, tab 30 at 5) The government fails to explain how its failure to meet the minimum ordering requirement is within the scope of the release which, by its terms, applies to "further equitable adjustments attributable to such facts and circumstances giving rise to [the] proposal dated April 7, 2017." The amount of services ordered by the government was not a "fact or circumstance giving rise to the proposal," hence, we hold that Amentum did not waive its claims by signing the bilateral modification and that the Air Force breached the contract by failing to order the contractual minimum amount.

### Findings of Fact Pertaining to Claim 2 ASBCA No. 62836: SSPF Reduced Maintenance

The KPLSS contract included TIN 510 for "Fixed Systems Maintenance – SSPF Systems" that provided routine maintenance for different types of systems across two buildings within the Space Station Processing Facility (SSPF):

> Fixed System Maintenance – Space Station Processing Facility (SSPF) shall include all tasks and resources necessary to maintain the assigned pneumatic, cryogenic and vent systems at the following facilities:
> M7-0360 Space Station Processing Facility $GO_2$
> $LN_2/GN_2$Ghe Bair

---

[7] Amentum asserts that TO NNK160M17T was partially descoped on January 8, 2018, and that it will address the specific shortfall in the quantum phase (app. br. at 16 n.3).

M7-0361A Ammonia Vapor Containment Building GN$_2$

(R4, tab 2 at 122)  After KPLSS was awarded, the International Space Station department (which occupied the facilities covered by TIN 510) determined that for the foreseeable future it no longer needed a subset of systems in these facilities (app. supp. R4, tab 32 at 2).  The department wanted to deactivate the unneeded subset and stop all routine maintenance on that subset of systems, while continuing the routine maintenance of the remaining active subset of systems (R4, tab 8 at 212-13; tab 1 at  243–45).  The unneeded subset of systems was deactivated under task order NNK15539043R, dated August 1, 2016 (R4, tab 13 at 242–45).

The parties subsequently disagreed regarding the proper way to modify the contract to provide the reduced level of service.  The contract contained attachment J-02 which described "Maintenance Services" in § 00500 as follows:

> Maintenance Services are for fixed systems at a customer location or facility, or customer dedicated or owned mobile and portable equipment.  Customer dedicated equipment and fixed systems may be for a specific customer or a specific subset of customers that is not shared by multiple customers. Active Maintenance requires all the maintenance as stated within the appliable OMI or job plan.

(R4, tab 2 at 120)  The same section of Attachment J-02 § 00500 describes "downmode maintenance" as follows:

> For the fixed system maintenance, downmode maintenance will be the active maintenance with (1) no filter change-out required and (2) relief valve operational check within three years of previous operational check. Any non-routine maintenance on the 00500 services TINS shall be negotiated on an as-needed basis and executed through issuance of a TO utilizing TIN XXX702 Technician Hourly Rate and the cost of replacement parts.

(*Id.*)  The Contract contains the following definition for "Downmode:"

> Downmoded:  Systems or Equipment that has no current requirement but may in the future.  The system or equipment will be stored and little or no maintenance will occur as based on the OMI or JP requirements.  If the equipment is needed, it can be returned to active status.

10

(R4, tab 3 at 143)  The Contract contains the following language in section B.1:

> Downmode Maintenance:  If a customer requires the
> downmode maintenance, as described in Attachment J-02,
> *Catalog of Services to be Provided*, Series 00500
> Maintenance Services for Fixed Systems, the Contractor
> will be notified 30 days in advance of the applicable
> Government Fiscal Year (GFY).  The maintenance will be
> performed at a downmode level for the entirety of the
> GFY.  The percent reduction will be applied to the
> applicable TINs for which downmode maintenance will be
> performed.  The percentage for any applicable downmode
> TIN is decreased by 3.0%.

(R4, tab 1 at 7)

The government never considered using the downmode maintenance provision of the contract to address the reduction in maintenance at the SSPF, and instead created a new TIN 528 (tr. 2/165).  In estimating the cost of new TIN 528, NASA estimated that the remaining active systems would require significantly fewer labor hours than the hours required under TIN 510; resulting in an estimated 56.6% reduction in required labor hours for the contractor (R4, tab 64 at 1; jt. Stip. ¶ 20).  More specifically, NASA estimated that the reduced maintenance required by TIN 528 would result in labor savings of approximately 348.48 labor hours in the first year (R4, tab 64 at 1).

On January 6, 2016, NASA sent Amentum a request for proposal to price the new TIN, named 528 SSPF Reduced Maintenance, to perform regular maintenance on the remaining active subset of SSPF systems (R4, tab 8 at 212-13; jt. Stip. ¶ 21).  In proposing its price for the new TIN 528, Amentum estimated the labor and other costs that it would save in no longer maintaining the deactivated equipment (R4, tab 9 at 218).  It estimated labor hour savings of approximately 416 hours per year (roughly a 20% greater reduction than the government's own estimate) in the first contract year and submitted a price of $1,851.20 per month less than its TIN 510 price, for a proposed TIN 528 price of $12,064.39 per month (jt. Stip. ¶ 22).  Amentum stated in its proposal:

> To price this new TIN, [Amentum] used negotiated TIN
> 510 as a basis and then descoped hours for the work that is
> not needed under the reduced maintenance.  [Amentum]
> priced: -416 hours for GFY2016, -500 hours for GFY2017,
> GFY2018, and GFY2020, and -420 hours for GFY2019

11

based on the removal of the following equipment from the
SSPF Fixed Maintenance Systems (TIN 510).

(R4, tab 9 at 218; jt. Stip. ¶ 23)  Amentum stated in its proposal that it used TIN 701
(Labor Services for Engineers) and TIN 702 (Labor Services for Technicians) as a
basis for its proposed labor rates in TIN 528 and clarified that TINs 701 and 702 were
"fully burdened through G&A [General and Administration] and profit.  This rate also
includes a factor that represents materials/ODCs [Other Direct Costs] per hour" and
because "the TIN rate is fully burdened through G&A, and no additional materials and
ODCs are being proposed, no additional G&A is being priced" (R4, tab 9 at 219; jt.
Stip. ¶ 24).  The contract required offerors to propose fully burdened rates (R4, tab 1
at 7).

In response, NASA requested that Amentum submit a new proposal, from the
"bottom [] up" (tr. 2/74-75).  NASA also requested that Amentum use TINs 701 and
702 to price labor in the new TIN 528 (tr. 2/74-76).  Testimony at the hearing
demonstrated that when Amentum bid on KPLSS, it did not fully burden the labor
rates in TINs 701 and 702:  "They were burdened through G&A and profit, but they
had no allocation for any of the cost pools. . . . [W]e assumed we would be using
[those TINs] infrequently" (tr. 2 /110–11).  "[W]e only captured labor, fringe, G&A
and fee on those.  We did not spread any of the cost pools because we didn't feel that
those would be executed as much as some of the other work" (tr. 2/55–56).  NASA
agreed to Amentum's revised TIN 528 proposal, except for its proposed 6.5% profit
percentage.  NASA counteroffered for 4% profit because a 4% profit applied across
the rest of the contract; the proposed work was within KPLSS's original scope; and the
proposed work carried risk and technological innovation levels commensurate to the
rest of the KPLSS contract.  (R4, tab 10 at 222-24)  Amentum, through its contract
administrator, Lisa Shirah, accepted NASA's counteroffer (R4, tab 11 at 226).
Amentum's program manager, Mr. Ostarly, testified that Amentum entered into the
bilateral modification "just because we got wore out" and that they "rolled and
accepted the TINs" (tr. 1/88).  NASA and Amentum executed bilateral modifications 9
and 10, which added TIN 528 to KPLSS.  Both modifications include release language
providing that:  "This supplemental agreement is entered into pursuant to authority of
Mutual Agreement of the Parties" (R4, tab 12 at 228, 235).

NASA subsequently agreed that Amentum could add indirect cost pools in
proposing pricing, but it did not permit Amentum to apply the indirect cost pools to
TIN 528 (tr. 2/76-78).  NASA incorporated the change into the Solicitation for
KPLSS II which states:

> (3) The Government recognizes that original TIN prices
> may include a variety of costs not directly related to
> performance of each TIN . . . .  Therefore, when

12

negotiating new or existing TINs during contract
performance, the Contractor may propose an amount that
represents such apportionment of cost pools applicable to
the new TIN price being negotiated.

(App. supp. R4, tab 27 at 4)

### DECISION Claim 2 ASBCA No. 62836:  Downmode Maintenance

Amentum alleges two errors on the part of NASA:  first, that TIN 510
contained a "downmode" maintenance provision that should have been used to price
the services rather than creating a new TIN 528; and second that Amentum should
have been allowed to price TIN 528 by subtracting the labor saved from the TIN 510
price, rather than calculating a "bottom-up" price using labor rates that were not fully-
burdened in Amentum's proposal (app. br. at 22).  Although not fully developed in the
briefing, the distinction between top down and bottom up pricing is because Amentum
failed to fully burden the TIN 701 and 702 labor rates with cost pool allocations
(tr. 2/55-56, 110-11), despite solicitation instructions to propose fully burdened pricing
(R4, tab 1 at 7).  Thus, a "top down" calculation deducting the labor savings from TIN
510 would include overhead charges for cost pools (and, in fact could overcompensate
Amentum to the extent that the labor hour deductions calculated using TINs 701 and
702 would not reduce the cost pool allocation) but a "bottom up" calculation would
exclude cost pools in the labor burden for all the labor hours in the TIN.

However, we need not venture deep into the weeds to determine Amentum's
cost pool overhead burden because Amentum agreed to TIN 528 in a bilateral contract
modification.  That is, Amentum and NASA agreed that Amentum would perform the
work specified in TIN 528 in exchange for the payments specified in TIN 528.  A
bilateral modification constitutes an accord and satisfaction where the parties agree to
a substituted performance, here a new TIN, in satisfaction of a claim.  *See, e.g.*, *Moore
Overseas Constr. Co.,* ENGBCA No. PCC-125, 98-1 BCA ¶ 29,682 at 147,029.  The
parties' contractual obligations have been discharged by performance, and there is
nothing for the Board to review, because Amentum has not alleged facts sufficient to
cause us to review the contract modification.  For example, the Board may decline to
enforce a bilateral modification where the government possessed superior knowledge,
breached the duty of good faith and fair dealing, where there was a differing site
condition, or government caused delay.  However, Amentum simply alleges that the
parties should have agreed to a different dollar amount.  Amentum does not allege that
it was coerced into signing the modification.  In fact, Mr. Ostarly testified that he just
was worn down and gave up (tr. 1/88).

Amentum argues that the release language in the modification does not prevent
it from seeking to reopen the modification (app. reply at 11).  Amentum cites

13

*Advanced Bus. Concepts, Inc.*, ASBCA No. 55002, 06-1 BCA ¶ 33,271 at 164,893 for the proposition that a bilateral modification does not bar a later claim on the modification. However *Advanced Bus. Concepts* is easily distinguished. That decision was on a motion for summary judgment and was not a decision on the merits. In addition, in *Advanced Business Concepts* there was evidence that the parties had continued negotiating the terms of the modification after the date of the bilateral modification. *Id.* Amentum asserts that "the parties continued to revisit the issue of the proper pricing of new TINs through the remainder of KPLSS I until NASA finally agreed with Amentum's position" (app. reply at 10 (citing tr. 2/76-78)). However, the testimony cited by Amentum was that NASA agreed to wage rates including additional overhead costs in negotiating new additional TINs after TIN 528 (and the TINs in dispute in claim 3 below). There was no testimony of continued negotiations regarding TIN 528 (or the claim 3 TINs).

Amentum also cites (with regard to claim 3 below, but equally applicable here) to *Mass. Bay Transp. Auth. V. United States*, 129 F.3d 1226, 1235-36 (Fed. Cir. 1997) (*MBTA*) for the proposition that we must take into account the circumstances surrounding a mutual contract modification to determine if it is an integrated settlement (app. br. at 27 n.8). Once again, the authority is easily distinguished. In *MBTA* the Federal Circuit was reviewing a grant of summary judgment when it held that it was appropriate to consider the circumstances surrounding a cost that had been disputed for three years before the parties signed a change order, in determining whether the change order was intended to be a fully integrated settlement of a disputed issue. *MBTA*, 129 F.3d at 1235-36. Here, NASA accepted Amentum's proposal. At the hearing there was conflicting testimony as to whether NASA directed to Amentum to calculate its proposal using a "bottom-up" method (tr. 2/74-75, 108-09). NASA did question the profit rate on Amentum's proposal, and Amentum accepted the change from 6.5 percent to 4 percent (R4, tab 10 at 222). The bilateral contract modification contains no reservations of rights, and states that the "supplemental agreement is entered into pursuant to authority of Mutual Agreement of the Parties" (R4, tab 12 at 228, 235). For the reasons stated above, we deny appeal No. 62836.

### Findings of Fact Pertaining to Claim 3 ASBCA No. 62837: TINs 224-27

During March and April 2016, the parties negotiated the addition of four new task item numbers (TINs 224-27) to the contract, to include the provision of cylinders of specialty gases (R4, tab 15 at 248-60, tab 16 at 261-63). Amentum's proposal used negotiated TIN 701A (Engineering Hourly Rate) and TIN 702A (Technician Hourly Rate) from Table B.1.1 of the KPLSS contract. These rates were "fully burdened through G&A and profit." (R4, tab 15 at 253, 258) Amentum additionally provided that: "While G&A is normally applied to labor and non-labor, since we are utilizing negotiated fully burdened labor TINs, we are only applying G&A to non-labor in this

14

proposal" (*id.* at 253-54, 259). As with TIN 528 in claim 2 above, Amentum initially proposed a 6.5% profit to the non-labor aspect of TINs 224–227 (*id.* at 253-54, 259).

NASA accepted Amentum's proposal, except for the proposed 6.5% profit, and, for the same reasons as in TIN 528, NASA countered with a 4% profit (R4, tab 10 at 222, tab 16 at 262–63). Amentum accepted this counteroffer (R4, tab 16 at 262). In April 2016, the parties entered into bilateral Modification 8 with the statement that "This supplemental agreement is entered into pursuant to authority of Mutual Agreement of the Parties" (R4, tab 17 at 265).

## DECISION Claim 3 ASBCA No. 62837: TINs 224-27

The resolution of claim 3 is similar to that of claim 2. Once again, Amentum asserts that it should have been able to propose new labor rates for new TINs (app. br. 26). Left unsaid is that Amentum wanted to propose new labor rates because of its failure to burden the labor hours for TINs 701 and 702 with indirect cost pool allocations despite the solicitation's requirement that bidders propose fully burdened labor rates in the TINs (R4, tab 1 at 7). Once again, Amentum entered into a bilateral modification with NASA to add the new TINs. As with claim 2, we find that the bilateral modification constitutes an accord and satisfaction where the parties agree to a substituted performance, here a new TIN, in satisfaction of a claim. *See, e.g.*, *Moore Overseas Constr. Co.,* 98-1 BCA at 147,029. The parties' obligations were discharged through performance. Amentum's argument that we must consider the circumstances surrounding the modification is rejected for the same reasons as in count 2. For the reasons stated above, appeal No. 62837 is denied.

## Findings of Fact Pertaining to Claim 4 ASBCA No. 62838: Jet Fuel TIN

The total evaluated contract price for KPLSS consisted of the sum of all the offeror's proposed unit prices multiplied by the government-provided "Best Estimated Quantity" (BEQs) for each TIN for all years, plus the proposed price for phase-in (*see* R4, tab 20 at 288-89). The RFP for KPLSS sates, "[n]otwithstanding the BEQs, there will be no stated minimum or maximum quantities, per TIN, in the resulting contract. BEQs are for evaluation purposes only and do not represent an obligation commitment by the Government" (R4, tab 18 at 278).

Contract TIN 220A – Bulk Kerosene required Amentum to provide jet fuel to the customer's location using a tanker or refueler (R4, tab 2 at 113). Amentum's fully loaded price for jet fuel was $6.99 per gallon for FY 2016, and slightly more in subsequent years (*see* R4, tab 1 at 9). The fully-loaded price for TIN 220A included the cost of maintenance of fuel-pumping facilities (app. supp. R4, tab 44 at 3). The TIN price was deemed to be too expensive by some users, and NASA subsidized the cost of fuel for those customers (tr. 1/55-57, 168-69).

15

In early 2018, NASA customer Space Florida, which leased from NASA the former Shuttle Landing Facility (SLF), developed its own jet fuel fueling capability and discontinued use of KPLSS for that purpose. In addition, NASA and the Air Force stopped using the KPLSS contract facilities and purchased jet fuel from Space Florida (tr. 1/57). This change greatly reduced use of the KPLSS jet fuel equipment (app. supp. R4, tab 47 at 3). By notice dated June 15, 2018, NASA directed Amentum to deplete the existing commodity inventory and excess all equipment supporting jet fuel support operations (*id.* at 3, 6). NASA did not issue a contract modification or change order deleting TIN 220A, which remained part of the contract (*see* tr. 1/57). Billings under TIN 220A declined from 47,332 gallons in FY 2016 to 6,857 gallons in FY 2018, to 0 gallons in FY 2019 and FY 2020 (R4, tab 4 at 170).

### DECISION Claim 4 ASBCA No. 62838:  Jet Fuel TIN

As detailed above, the KPLSS contract had a guaranteed total contract value, but did not have guaranteed minimum values for individual TINs. A single award IDIQ contract does not provide exclusivity to the contractor. *Travel Ctr. V. Barram,* 236 F.3d 1316, 1319 (Fed. Cir. 2001). The proposals were evaluated based on BEQs but the BEQ amounts were not contract minimums. Amentum asserts that it is entitled to compensation because it had an expectation that it would be able to sell jet fuel under the contract (app. br. at 28). Amentum's theory of recovery is not clear in its briefing. Amentum asserts that the minimum quantity requirement of an IDIQ contract "does not constitute the outer limit of all of the Government's legal obligations" (*id.* (quoting *Cmty. Consulting Int'l*, ASBCA No. 53489, 02-2 BCA ¶ 31,940 at 157,789)). Amentum also appears to allege a breach of the duty of good faith and fair dealing, asserting that NASA "cooperated with Space Florida . . . in its efforts to develop an independent jet fueling facility" (app. br. at 27).

Amentum's first argument, citing *Cmty. Consulting Int'l*, asserts that there are additional legal obligations on the government beyond the minimum quantity requirement in an IDIQ contract. In *Cmty. Consulting* the Board denied a motion to dismiss (treated as a motion for summary judgment) where the contractor asserted that the government had denied it the opportunity to compete for additional awards in a multiple award IDIQ contract. *Cmty. Consulting*, 02-2 BCA ¶ 31,940 at 157,789. The Board rejected the government's argument that Community Consulting had received the guaranteed minimum award amount, and so was without a remedy. *Id.* Unlike in *Cmty. Consulting*, where the contract provided appellant with the right to compete for additional awards, here Amentum does not cite to contact provisions entitling it to relief such as a provision requiring NASA to purchase its jet fuel from Amentum or a contractual requirement to purchase a minimum amount of jet fuel.

16

Turning to Amentum's second argument, that NASA violated the duty of good faith and fair dealing, there is, of course, an implied duty of good faith and fair dealing in every government contract. *See, e.g.*, *Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012). However, Amentum cites no support in the record of government actions breaching that duty, other than the contract modification, which simply notes that the shuttle landing facility "changed its supply source" due to Space Florida's installation of a jet fuel tank (app. supp. R4, tab 47 at 3). Amentum put no evidence of the alleged cooperation between NASA and Space Florida on the hearing record. Instead, Amentum alleges, without citation to the record, that the contract provided Amentum with "what amounts to a franchise for pumping all or most of the jet fuel used at the Kennedy Space Center" (app. reply at 13). The government presented the unrebutted testimony of the Contracting Officer's Representative for the KPLSS contract, Mr. Jonathan Partridge, that to his knowledge nobody from NASA asked or encouraged Space Florida to develop its jet fuel facility (tr. 2/189-90). On the record before us, we hold that Amentum has not demonstrated a government violation of a contract provision and has not demonstrated a breach of the duty of good faith and fair dealing. Appeal No. 62838 is denied.

**Findings of Fact Pertaining to Claim 5 ASBCA No. 62839: Hurricane Shutdowns**

The contract, as modified, incorporated NASA clause 1852.242-72 – DENIED ACCESS TO NASA FACILITIES (OCT 2015), which provides that NASA may deny contractor access to NASA facilities for various reasons including adverse weather such as hurricanes. In the event of a facility closure, the contract clause provides that:

> (d) For the period that NASA facilities were not accessible to contractor employees, the contracting officer may –
> (1) Adjust the contract performance or delivery schedule for a period equivalent to the period the NASA facility was not accessible;
> (2) Forego the work;
> (3) Reschedule the work by mutual agreement of the parties; or
> (4) Consider properly documented requests for equitable adjustment, claim, or any other remedy pursuant to the terms and conditions of the contract.

(Gov't hrg., ex. 1 at 5)[8]

---

[8] The applicable contract modification was not included in the Rule 4 file; however, the parties had previously stipulated to the language of the contract clause.

17

NASA directed the shutdown of KSC for Hurricanes Matthew (October 5-11, 2016—five days); Irma (September 8-15, 2017—seven days); and Dorian September 3-5, 2019—three days) for a total of fifteen days of base closure (jt. stip. ¶ 33). Amentum paid its employees during the first two hurricane shutdowns, not requiring them to take unpaid leave or personal time off (tr. 2/78). However, Amentum did not pay its employees during the shutdown for Hurricane Dorian. Employees had the option of taking unpaid leave or personal time off (vacation pay). As a result, the union representing Amentum's hourly workers filed a grievance. (Tr. 2/81-82; app. supp. R4, tab 59 at 2)

Apart from the "ride out" services performed for the Air Force during the hurricane shutdowns, Amentum did not perform any work on TINs or other work during the hurricane shutdowns. Because the Kennedy Space Center was closed no governmental or commercial KPLSS customers ordered nor did Amentum perform any TIN work during the shutdowns. (Tr. 2/42-43, 82–83)

Under the predecessor contract, ISC, a cost-plus contract, Amentum allowed employees to charge personal leave time or go unpaid during hurricane closures, and the government would pay for Amentum's costs so Amentum could "pay the labor out" (tr. 2/14-15). Amentum discussed with NASA the possibility of submitting an REA to recover its extra costs incurred during Hurricanes Matthew and Irma, but NASA told Amentum that it would not pay such an REA (tr. 2/44-45, 82-83). Amentum consequently chose not to submit an REA to NASA for Hurricanes Matthew and Irma at the time (*see* tr. 2/83). Amentum did submit an REA to the Air Force for "ride-out" services performed for the Air Force during the hurricane shutdowns (tr. 2/82-83). During each of the hurricane closures under KPLSS, the work that would have regularly been performed during that time was either canceled or rescheduled (tr. 2/19–21, 194–97). During the hurricane closures, Amentum did not reassign its staff to any other non-KPLSS work (tr. 2/22). NASA paid Amentum for all of the KPLSS work completed under the contract during the hurricane base closures, as well as the work that was rescheduled or adjusted after the shutdowns (tr. 2/198).

During the hearing in these appeals, there was conflicting testimony regarding the documentation supporting Amentum's hurricane shutdown claims. The conflicting testimony mostly concerns the sequence of events, such as whether a request occurred before or after Amentum's certified claim. At NASA's request, Amentum reported to NASA the labor hours it had lost during the hurricanes (tr. 2/44-45, 114-18). Amentum filed a certified claim for costs incurred during the three hurricane shutdowns on June 19, 2020 (R4, tab 4 at 159-60). The Contracting Officer, Michael Ahearn, contacted Amentum three times about the certified claim: (1) in August 2020, to request additional time to respond to the claim; (2) in October 2020, to request additional time to respond to the claim; and (3) in January 2021, to inquire

18

whether Amentum had previously filed an REA concerning the hurricane shutdowns (app. supp. R4, tab 52 at 2-3; tr. 4/9-10). Apart from the information concerning prior REAs requested in the January 21, 2021, email, Mr. Ahearn did not request any substantive information concerning the hurricane shutdown claim (app. supp. R4, tab 52 at 2; tr. 4/10). Amentum's Susan Germano searched for the information Mr. Ahearn requested but was unable to find either a previous REA or emails from Ms. Lisa Shirah. The Shirah emails were inaccessible because they were on NASA servers to which Amentum no longer had access after Ms. Shirah left the company. (Tr. 4/11-12). By email dated January 25, 2021, Ms. Germano advised Mr. Ahearn that she was unable to find the information he had requested (app. supp. R4, tab 52 at 2). The contracting officer requested no other information from Amentum and denied the claim 22 days later, on February 16, 2021 (tr. 3/145; R4, tab 5 at 184-85). In either its REA or its certified claim, Amentum never provided the government with any payroll data or pay stubs to verify it had paid its employees anything during the hurricane closures (tr. 2/114–17, 4/13, 16).

## DECISION Claim 5 ASBCA No. 62839: Hurricane Shutdowns

Amentum seeks compensation pursuant to contract clause 1852.242-72 – DENIED ACCESS TO NASA FACILITIES (OCT 2015) (app. br. at 29-33). According to Amentum, the "'[d]enied access to facilities' is analogous to government delay of work in construction and other fixed-price contracts where the government is required to compensate the contractor for costs incurred due to changes in the scope of work and government-caused delays" (app. br. at 30). However, Amentum ignores the distinction between "government-caused" delays and an act of God, such as a hurricane. The contract provision provides that in the event of denied access to a NASA facility, the contracting officer has four options: adjusting the performance or delivery schedule; foregoing the work; rescheduling the work; or considering requests for equitable adjustment (gov't hrg., ex. 1 at 5). From this provision stating that a contracting officer "may" consider an equitable adjustment, Amentum asks us to find that the contracting officer was required to grant it an equitable adjustment.

Amentum's argument ignores the fact that the KPLSS contract was a firm-fixed-price contract, so the risk of increased performance costs, absent a contract provision providing otherwise, falls on the contractor. *See, e.g.*, *Chevron U.S.A., Inc.*, ASBCA No. 32323, 90-1 BCA ¶ 22,602 at 113,426. NASA clause 1852.242-72 – DENIED ACCESS TO NASA FACILITIES, provides that the contacting officer "*may*" take several actions in response to a denial of access to the base, including rescheduling the work, forgoing the work, or adjusting the delivery schedule, in addition to considering an equitable adjustment. The evidence of record demonstrates that NASA paid Amentum for all of the KPLSS work completed under the contract during the hurricane base closures, as well as the work that was rescheduled or adjusted after the shutdowns (tr. 2/198). To the extent Amentum is relying upon the

19

clause provision that the contracting officer "*may*" consider an equitable adjustment, such consideration would be reviewed pursuant to an abuse of discretion standard. *See, e.g.*, *Amatea/Grimberg JV*, ASBCA No. 60426 *et al.*, 23-1 BCA ¶ 38,366 at 186,329-30. Amentum has not established an abuse of discretion on the part of the contracting officer. The parties' dispute regarding the sufficiency of the payroll information is not relevant given that the contracting officer was not required to grant an equitable adjustment even if the payroll information were proven. Appeal No. 62839 is denied.

### Findings of Fact Pertaining to Claim 6 ASBCA No. 62840: Gaseous Nitrogen Support

The KPLSS contract contained fixed price tasks for launch support and gaseous nitrogen contingency support. Launch support (TIN 212) typically involved a single technician, but one launch customer required a second technician (tr. 2/202-03). Gaseous nitrogen contingency support (TIN 223) involved setting-up equipment to provide liquid nitrogen in the event of an outage of the liquid nitrogen plant operated by Air Liquide, S.A. during a critical period for launch preparation (tr. 2/35-36). Unlike launch support, gaseous nitrogen support required between two and six technicians, depending on the customer and type of launch (tr. 3/42). For any given launch for which TIN 223 was ordered, Amentum decided how many technicians or engineers were required to staff the TIN (tr. 2/211). Information on how many technicians or engineers were required to staff the TINs was contained in the GSPN handbook, provided to offerors as part of the solicitation documents (tr. 2/209–11). Amentum developed the GSPN handbook under the ISC, KPLSS's predecessor contract, and knew how many technicians or engineers were typically required to staff each TIN (tr. 2/210–11).

TIN 212, Launch Support, was defined as follows:

> Launch Support shall include all tasks and resources necessary to provide Ground Support Pneumatics (GSPN) console support at the CCF during a launch countdown or major test and required planning support. This service includes personnel support required to fulfill customer requirements as well as the support DRD 1-15, Launch Readiness Statements; DRD 1-16, System Level Readiness Reviews; DRD 2-7, Launch Readiness Plans; and GSPN post-launch debriefings as described by PWS 3.1.D.i.

(R4, tab 2 at 111)

The contract defined TIN 223, GN$_2$ [Gaseous Nitrogen] Contingency Support, as follows:

> GN$_2$ Contingency Support shall include all tasks and resources necessary to provide a contingency GN$_2$ source at the CCF to continue a launch countdown or major test in the event of a failure at the GN$_2$ plant. This service includes [Systems & Equipment] preparation and personnel support required to fulfill customer requirements.

(R4, tab 2 at 114)

Also relevant to the appeal are TINs 701 (Engineer Hourly Rate) and 702 (Technician Hourly Rate) (R4, tab 2 at 127). Both TINs provide that the rate is to establish "the price for an engineer during normal shift for work that is not specifically described above" and "the price for either a propellant or life support technician during normal shift for work that is not specifically described above" (*id.*). Ms. Deborah Gorman, Amentum's Business Operations Manager, testified that Amentum bid TIN's 212 and 223 assuming that the TIN represented the hourly rate for a single worker (tr. 2/57). This was because the number of workers could vary, and the TINs referenced TINs 701 and 702 which were bid on an hourly basis (tr. 2/57-58). Ms. Gorman also testified that a lack of historical information on staffing for the TIN was an added source of confusion as to whether TIN 223 was being bid on a per worker basis (*see* tr. 2/58-59, 3/46).

Amentum's bid prices for TINs 212, 223, 701 and 702 for FY 2016, beginning October 1, 2015, were:

| TIN | Description | Price |
|------|-------------|-------|
| 212A | Launch Support | $159.06 |
| 212B | Launch Support (off shift) | $154.94 |
| 223A | GN$_2$ Contingency Support | $143.48 |
| 223B | GN$_2$ Contingency Support (off shift) | $365.26 |
| 701A | Engineer Hourly Rate | $61.45 |
| 701B | Engineer Hourly Rate (off shift) | $61.45 |
| 702A | Technician Hourly Rate | $53.40 |
| 702B | Technician Hourly Rate (off shift) | $77.72 |

(R4, tab 1 at 9, 11) Thus, TIN 212A, which typically required a single worker was billed at $159.06, while TIN 223A, which typically required 4 to 6 workers, was billed at $143.48. However, for the off-shift work, TIN 223B was priced more than double the rate for TIN 212B ($365.26 vs. $154.94).

21

In accordance with the KPLSS RFP, the government performed a FAR 15.404-1(b), Price Analysis, evaluating proposals on the basis of the total evaluated price which consisted of the sum of all the offeror's proposed unit prices multiplied by the government-provided BEQs for each TIN for all years, plus the proposed price for phase-in (R4, tab 20 at 288–89). During proposal discussions, NASA requested additional information from Amentum regarding its overall pricing methodology because the total evaluated price was below the minimum contract value (R4, tab 21 at 293). Amentum's response to this inquiry included the following statement:

> Business Case was developed by grouping specific TINs anticipated to be used regularly and ensuring allocations were spread among these TINs; purposely identifying TINs where work was more likely to occur (i.e. 300 series – Life Support, 500 – Fixed Systems Maintenance); allocations were not spread evenly among TINs.

(R4, tab 21 at 293)

Also, during proposal discussions, NASA requested information from Amentum concerning its prices for the 300 Series "ELSA" TINs. NASA pointed out pricing mistakes to Amentum with respect to those TINs (tr. 3/12–13). The KPLSS source evaluation board understood that Amentum's ELSA pricing was a mistake because the price for each ELSA TIN decreased when more units were ordered—that is, as originally proposed, the government could order five ELSA units at a price significantly lower than the price of ordering a single ELSA unit (tr. 3/12–13). Amentum changed its pricing on the ELSAs following proposal discussions (tr. 3/13–14). NASA also made note of discrepancies in the prices for TIN 223, but did not bring any alleged errors to the attention of Amentum (tr. 3/8-11). The KPLSS source evaluation board believed that nuances in pricing of services could be built into Amentum's business case; the source evaluation board did not request a full breakdown or specific elements of cost for each service, because it could not evaluate that information (tr. 3/15–16). In bidding TIN 223, Amentum priced all tasks and resources necessary to provide one technician for one hour to perform $GN_2$ contingency services. Amentum's Jerry Korte testified on cross-examination that he was aware that TIN 223 would require more than one person, and that he told this to the employees drafting the proposal (tr. 1/189-90). He further testified that he was aware that the proposal did not propose a price high enough to cover four staff and that he questioned the pricing model (tr. 1/190). He accepted the pricing as being a business decision to provide a more competitive bid (tr. 1/190-91). He also testified to his understanding of Amentum's pricing strategy of not spreading the price allocation evenly among TINs and pricing differently TINs that Amentum thought were more likely to be ordered (tr. 1/195-96) Mr. Korte discovered an apparent bid error with

22

respect to TIN 223 shortly after award (tr. 1/150-51). Korte brought the bid error to the attention of NASA's Ken Madyda, who told him that nothing could be done about the error (tr. 1/158-59). NASA's then-Lead Contracting Officer, Marco Pochy, told Amentum, "[L]ook, you bid these prices. We can order these TINs at these prices for the life of the contract. And there's really no recourse" (tr. 1/161).

### DECISION Claim 6 ASBCA No. 62840: Gaseous Nitrogen Support

Amentum makes two arguments regarding the gaseous nitrogen claim. First, Amentum alleges that TIN 223 was ambiguous as to whether it was an hourly price per engineer or an hourly price for all necessary labor. Amentum argues that the provision should be construed against the drafter (NASA) and be interpreted as an hourly rate per engineer. Second, if TIN 223 was not ambiguous, Amentum asserts that there was a bidding error that entitles it to relief.

### A. TIN 223 Is Not Ambiguous, And Even If It Were Ambiguous, The Ambiguity Would Be Patent

According to Amentum, the description for TIN 223 is ambiguous because there are only four TINs in the KPLSS contract that are hourly rates, and each of the other hourly TINs were for single employees (app. br. at 34). The other hourly TINs were 212, console support, and 701 and 702 Labor Services for Engineers and Technicians. However, a comparison of the TINs does not support Amentum's argument. TINs 701 and 702 each provide that the rate is to establish "the price for *an engineer* during normal shift for work that is not specifically described above" and "the price for either *a propellant or life support technician* during normal shift for work that is not specifically described above" (R4, tab 2 at 127) (emphasis added). The language in TINs 701 and 702 are clear that the TIN applies to a single worker, "an engineer" or "a propellant or life support technician" (*id.*). Conversely, TIN 223 provides that it "shall include all tasks and resources necessary" for gaseous nitrogen contingency support "includ[ing] [Systems & Equipment] preparation and personnel support required to fulfill customer requirements" (*id.* at 114).

Both Amentum and the government claim that TIN 212 supports their interpretation of TIN 223. Amentum asserts that TIN 212 was the hourly rate for a single worker, and thus the language that the launch support TIN "shall include all tasks and resources necessary to provide Ground Support Pneumatics (GSPN) console support at the CCF during a launch countdown or major test and required planning support" "include[ing] personnel support required to fulfill customer requirements" (*id.* at 111) was similar to the language in TIN 223 for multiple workers, making the language ambiguous. The government, conversely, points to the fact that TIN 212 could require two workers for some launch customers (*see* tr. 2/202-03), and thus arguing that the language in TINs 212 and 223 was not ambiguous.

23

We find that the language in TIN 223 was unambiguous in requiring "all tasks and resources necessary" and that it was not an hourly rate per worker. To the extent Amentum thought that it must be a cost per worker because of the variable staffing requirements of the TIN, it would be a patent ambiguity, requiring Amentum to inquire, rather than bidding on what it guessed the language to mean. *See, e.g.*, *Lebolo-Watts Constructors 01 JV, LLC*, ASBCA No. 59740 *et al.*, 21-1 BCA ¶ 37,789 at 183,432-33, *aff'd*, *Lebolo-Watts Constructors 01 JV, LLC v. Army*, 2022 WL 499850 (Fed. Cir. Feb. 18, 2022) (nonprecedential).

**B. Amentum Has Not Established a Bidding Error**

Amentum's final argument is that there was a bidding error. To recover for a bidding mistake, Amentum must establish that:

> (1) a mistake in fact occurred prior to contract award; (2) the mistake was a clear-cut, clerical or mathematical error or a misreading of the specifications and not a judgmental error; (3) prior to award the Government knew, or should have known, that a mistake had been made and, therefore, should have requested bid verification; (4) the Government did not request bid verification or its request for bid verification was inadequate; and (5) proof of the intended bid is established.

*McClure Elec. Constructors, Inc. v. Dalton*, 132 F.3d 709, 711 (Fed. Cir. 1997).

Amentum contends that its bid error was clerical or due to a misreading of the specifications, because Amentum obviously bid the cost of a single technician (app. br. at 35). Ms. Gorman's testimony supports this point (tr. 2/57). However, Mr. Korte's testimony on cross-examination calls into question whether this was actually a judgmental error. Mr. Korte admitted that he told the employees drafting the proposal that TIN 223 would require more than one worker, and that he was aware that the proposal did not propose a price high enough to cover four staff and that he questioned the pricing model, but accepted the pricing as being a business decision to provide a more competitive bid (tr. 1/189-91). Even assuming that Amentum has established that its bid was a misreading of the specifications, we find that Amentum has not established by preponderated evidence that NASA knew or should have known that Amentum made a mistake in its bid. The list of hourly TIN prices shows that Amentum bid $159.06 per hour for launch support (TIN 212A) which was typically performed by one technician, but sometimes two, and $143.48 for gaseous nitrogen contingency support (TIN 223A), which was typically performed by two to six technicians. The government asserts that it was unaware of a bidding error because it

24

performed a FAR 15.404-1(b), Price Analysis, evaluating proposals on the basis of the total evaluated price which consisted of the sum of all the offeror's proposed unit prices multiplied by the government-provided BEQs for each TIN for all years, plus the proposed price for phase-in (R4, tab 20 at 288-89). Moreover, the government points to the fact that Amentum had used a bidding strategy that did not allocate costs evenly among TINs but "group[ed] specific TINs anticipated to be used regularly and ensuring allocations were spread among these TINs; purposely identifying TINs where work was more likely to occur" (R4, tab 21 at 293; *see also* tr. 1/195-96). Amentum's proposal used a business strategy that sought to make its proposal more competitive by not allocating costs evenly among TINs. This strategy resulted in TIN rates that were questioned by Amentum's own employees (*see, e.g.*, tr. 1/190). Given Amentum's pricing for certain TINs, such as TIN 212 being cheaper off-shift than regular shift while the off-shift rate for TIN 223 was more than double the regular shift rate, we conclude that the government did not know and should not have known of a pricing error regarding the TIN 212 and TIN 223 rather than it being a business decision.

## CONCLUSION

For the reasons stated above, we grant appeal ASBCA No. 62835 and return it to the parties to negotiate quantum. Appeals ASBCA Nos. 62836, 62837, 62838, 62839, and 62840 are denied.

Dated: October 25, 2023

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

25

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62835, 62836, 62837, 62838, 62839, 62840, Appeals of Amentum Services, Inc., f/k/a AECOM Management Services, Inc., rendered in conformance with the Board's Charter.

Dated:  October 26, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals